Cowles *v.* Gridley.

---

COWLES, receiver of the Eighth Avenue Bank, *vs.* GRIDLEY.

A promissory note, given in payment of a subscription to the capital stock of a banking association, and discounted by the bank, for the maker, is upon a good consideration, and may be enforced by the receiver of the bank after its failure; notwithstanding that by an arrangement among the directors, of whom the maker was one, the instrument in question, and others of a similar tenor given by the others, were not to be considered as valid promissory notes, in the hands of any person, or for any purpose whatever, unless the directors should elect to pay their notes and take certificates of the stock.

And a renewal of such a note, at maturity, by the maker, on the assurance of the cashier that the interest paid " will come back to him on the making of a dividend to the stockholders," amounts to a determination of the maker's election to take the stock and to become absolutely bound for the amount.

THIS was an action upon a promissory note for $3650, made by the defendant, dated the 1st day of July, 1854, payable, with interest, to the defendant's own order, at the Eighth Avenue Bank, six months from date, and indorsed by him, belonging to the assets of said bank, of which the plaintiff was receiver. The Eighth Avenue Bank was a banking association, organized under the laws of 1838, and the subsequent

acts amendatory thereof. The articles of association were filed and recorded on the 5th day of August, 1853, and were signed by the defendant and eleven other persons, as the original associates, who therein declared themselves to have subscribed and taken the number of shares affixed to their respective names. The whole capital stock was $100,000, divided into two thousand shares of $50 each. The whole amount so affixed was $100,000, or two thousand shares, being the whole nominal capital of the bank. The amount affixed to the name of the defendant was two hundred shares, or $10,000. The persons so signing the said original articles were the first directors of the bank, and were named and designated as such in the articles. Before the articles were executed or drawn up, the several directors had procured in separate books, carried for that purpose by each, informal subscriptions to the capital stock of the contemplated bank, from a large number of persons, in various and small amounts, but which, including their own, made up the full amount of said contemplated capital, to wit, $100,000. Each of the directors was a subscriber in said informal subscription lists, and each for the full amount which he then intended to take and pay for, in the final organization of the bank; and each amount so informally subscribed was much less than the number of shares affixed to his name in the articles of association. The amount so informally subscribed by the defendant, and which only was then intended to be taken and paid for by him, was twenty shares, or $1000. The said informal subscriptions having been filled, the directors, in consultation with each other, but without any formal meeting, resolution, vote or action of the board, as such, and with the view to expedition, and the saving of labor and expense in perfecting the organization of the bank, by rendering unnecessary the formal subscription to the articles, and acknowledgment of each of the said informal subscribers, decided to divide, take and subscribe *pro forma* the whole of said capital stock among themselves, to pay the amount by them severally intended to be taken on their own account, according to their said several previous informal subscriptions, and to

Cowles *v.* Gridley.

hold the balance to be conveyed to the several other subscribers, as they should severally, by the payment of their subscriptions, be entitled to the same. The said articles of association were signed, and the number of shares affixed to the several names of the said twelve directors, pursuant to this purpose, understanding and agreement, and no liability was understood or intended to be assumed by their several subscriptions to the articles of association beyond the amount of their said several previous informal subscriptions. The articles of association being signed and duly filed and recorded, the said directors paid in, in cash, about $44,000 towards the capital stock of the bank, being the full amount of their several intended formal subscriptions, the defendant paying the full amount of his said twenty shares so intended to be taken and held by him. The bank being thereupon organized, purchased and deposited with the bank department of the state, proper banking securities to the amount of $100,000, and received from the department circulating bills to the same amount. The bank commenced the banking business on the 23d day of December, 1853. On the 1st day of January, 1854, there had been paid in by the directors and others of the said informal subscribers, towards the capital stock of the bank, the sum of $52,600, and on that day there yet remained a balance of unpaid subscriptions, amounting to $43,800. No stock had ever been issued to any party for such unpaid balance, or any part of it. The said balance of stock, being 876 shares, was thereupon divided equally among the several directors, amounting to seventy-three shares to each, and they gave their several notes for the same, each for $3650, and interest, dated January 1st, 1854, payable six months from date, to the order of some other director, and indorsed by the payees interchangeably. This was done at the solicitation of the president of the bank, and under a representation that a report then required by statute to be made to the bank department of the state, should show that the capital stock had been fully taken and issued, and with that object in view, but with an understanding and agreement among the said directors, without any formal action of the

board as such, that the arrangement should be wholly formal, creating no liabilities and conferring no rights whatsoever, unless or until the said directors should elect to pay their said notes severally and take certificates of said stock to themselves, or bring in other persons who should pay for and take such stock in their several places. A certificate for seventy-three shares of the stock was filled up without date, and signed by the president and cashier, to and in the name of each director, but such certificates were not cut from the certificate book, nor delivered to the said several directors, nor were intended to be, nor were they deemed or intended to be the stock of the persons named therein, unless or until the said directors should elect to pay their said notes severally, and take certificates of such stock. The notes were delivered to the cashier and were formally discounted on the books of the bank, and the proceeds placed in said books to the credit of the several makers, who thereupon drew their several checks upon the bank, each for the same amount as said credit, and to balance the same, and being the same amount as the par value of seventy-three shares of said stock, no actual payment of money on said checks being made; and appropriate entries were then made in the stock ledger and transfer book, showing that each of said directors held such shares. The several directors did not vote upon the stock represented by the notes, or exercise any rights or ownership over the same; and it was the understanding of the said parties in the entire transaction, that by it no rights should be acquired by the nominal holders of the stock, and no rights should be acquired by the bank in the notes, unless or until the directors should elect to pay their notes, severally, and take certificates of stock. The whole was intended by the parties as a temporary arrangement, until the unpaid subscriptions should be collected, or the full capital stock be otherwise paid in. On the 1st day of July following, the several notes then falling due, were renewed for six months on interest, omitting the indorsers, in pursuance of a formal resolution passed by the board of directors, and entered in the minutes, but for the same purpose and with the same understanding between all the

Cowles *v.* Gridley.

parties as when said first notes were made as aforesaid, and in continuation of said purpose and understanding. The interest on said first notes was paid to the bank by the several makers. When the defendant Gridley paid such interest on his said first note, he at first objected, and only paid the same on being told by the cashier that it would come back to him on the making of a dividend to the stockholders. The note in suit in this action was the defendant's note, given on said last mentioned occasion, in renewal as aforesaid. The capital stock of the bank was never fully paid in, otherwise than as above stated, nor did the defendant at any time bring in other subscribers to take said shares and pay for the same, nor did he do any other act indicating his election to take and pay for the same, further or otherwise than as above stated. The bank made its first default in payment on the 6th day of October, 1854, and became insolvent. The plaintiff was duly appointed receiver, on the 27th day of March, 1856.

Judgment was rendered for the plaintiff, at the circuit, for the amount of the note and interest; and a case was made, with liberty to either party to turn the same into a bill of exceptions. The defendant appealed.

*James Gridley*, for the appellant. I. The note in question was not a valid note, as between the original parties, or in the hands of the Eighth Avenue Bank. (1.) Because between them it was expressly intended not to be. (2.) Because it was utterly and designedly *without consideration.* (3.) Because, if adjudged otherwise, the consideration was the payment of a *stock subscription;* the transaction was unlawful, and the note is void by statute. (1 *R. S. 4th ed. p.* 1113 [589,] § 1, *sub.* 3. *See also, Gillett, receiver,* v. *Philips,* 3 *Kern.* 119.) That there was no intent by either party to make or receive the note as a valid obligation, admits of no doubt. In every stage of the transaction, from the original subscription to the making, discounting and renewal of the note, it was accompanied by the reiterated protest of both parties, that the whole transaction was *formal* merely, and not intended to create, and should not

Cowles *v.* Gridley.

create any liabilities, or confer any rights upon either party, without their further action. The case puts this as a distinct finding of fact.

II. That there was, therefore, *no consideration*, follows of course, as a logical result. But not more as a logical result than as a matter of independent fact. The filling up of the stock certificate, and signing it, did not make the stock the property of the defendant, or give him any interest in it. Even a *delivery* would not necessarily have had that effect, for fraud, accident or mistake would have avoided a delivery. But here there was not only *not a delivery*, but a distinct declaration that there " was not intended to be a delivery, *nor was the stock deemed or intended to be the property of the defendant*, unless hs should elect to pay his note and take a certificate." The whole thing rested in the future " election" of the defendant, and until that was made, conferred no rights upon either party. (*Goddard* v. *Cutts*, 2 *Fairf.* 440, 442.)

There was no law requiring the capital stock to be paid in, or that any " report" should so state. (1 *R. S. 4th ed. p.* 1140, §§ 139, 140, 144, 145, 156, 167, 177, 178, *sub.* 1, 3.) This is not a question of the contradiction of a written agreement by parol, but a question of fact as to the existence of the agreement at all. (3 *Cowen & Hill's Notes,* 1458. 3 *Hill,* 171. 14 *Wend.* 195. 24 *id.* 419.) No pretense can be made that the defendant has ever made an election to pay his note and take the stock. Nor can any importance be attached to the greater formality attending the *renewal* of the note, than in its original making, for the parties were always the same, and " the formal resolution [of renewal] passed by the board of directors, and entered in the minutes," was made " for the same purpose and with the same understanding between all the parties, as when said first notes were made as aforesaid, *and in continuance of said purpose and understanding*." It is clear that, *as between the parties*, the note is not valid, and the bank could not sue.

II. The rights of the receiver are not superior to those of the bank. A receiver, like an assignee, succeeds only to the rights of the insolvent, and takes, subject to all existing equities, de-

Cowles v. Gridley.

fenses and set-offs. And it is well settled that neither he, nor creditors under him, take as *bona fide* purchasers not even though the assets are negotiable promissory notes. (1 *R. S. 4th ed.* 1163, § 240. *Bur. on Assignments*, 438. 2 *Story's Eq. Jur.* § 1047, *n.* 6. 2 *Kent's Com. n. c.* 11 *Paige*, 21. 2 *id.* 567. 1 *id.* 125. 2 *John. Ch.* 441. 3 *Comst.* 479. *Id.* 19. *Hyde, receiver*, v. *Lynde*, 4 *Comst.* 387. 4 *Sand. S. C. Rep.* 604. 16 *Barb.* 294, 302. 2 *id.* 258, 478. *Mech. Bank* v. *N. York and N. Haven R. R. Co.*, 3 *Kern.* 599. 2 *Wash. R.* 233, 254. 11 *Alab. R.* 880.) It is conceded that the receiver represents the stockholders and creditors, as well as the bank. This will enable him to see that no unlawful disposition of the assets of the bank is made by the directors or trustees, and if attempted, to set it aside. Such were the cases of *Gillet, receiver St. Lawrence Co. Bank*, v. *Moody*, (3 *Comst.* 479 ;) *Same* v. *Philips*, (4 *id.* 114 ;) *Leavitt, receiver*, v. *Palmer*, (3 *id.* 19 ;) *Brouwer* v. *Hill*, (1 *Sandf. S. C. R.* 629,) and some others. All these cases go upon the ground that the assets being in fact the valid assets of the company, the act of the directors or trustees, in disposing of them, was unlawful, and the disposition void ; so that the assets remain still the property of the company, and as such passed into the hands of the receiver. The cases, therefore, do not conflict with the general statement above. But when the bank has no rights, the appointment of a receiver will not invest it with any. (*Hyde, receiver*, v. *Lynde*, 4 *Comst.* 387, *and the other cases supra.*)

III. Nor can this defence be resisted upon any general principle of an *estoppel*. Creditors are in privity with the *bank*, not with the defendant. To work an *estoppel in pais,* there must be an immediate and designed connection between the act or admission of the defendant, and the party affected by it. It can never be set up in favor of a stranger, but only between privies.. It is never to be presumed, but is always to be specially proved. (*Mech. Bank* v. *N. Y. and N. Haven R. R. Co.* 3 *Kern.* 599. 3 *John. Cases*, 101. *Dezell* v. *Odell*, 3 *Hill*, 215. *Reynolds* v. *Loundsbury*, 6 *id.* 534. *Pennell* v. *Hinman*, 7 *Barb.* 644. *Heane* v. *Rogers*, 9 *B. & C.* 577.

Cowles *v.* Gridley.

*Davis* v. *Field*, 4 *Met.* 381.    *Truscott* v. *Davis*, 4 *Barb.* 495.
8 *Wend.* 480.)

*C. H. Hunt*, for the plaintiff.   I. The subscription to the
capital stock of the bank, by the defendant and other original
associates, acknowledged and recorded in pursuance of the stat-
ute, was a contract by which each bound himself to all who
might become creditors or stockholders, to receive and pay for
the number of shares affixed to his name.   The private under-
standing among these associates, that such contract should be
no contract, cannot discharge the obligations aforesaid; nor
would such private understanding be admissible in evidence if
objected to on the trial.

·II. The giving of the note in question by the defendant was
but a continuation of his promise to pay for 73 out of the 200
shares, which he had before undertaken to pay for by the sub-
scription.

III. The defendant, as a director, held the relation of trus-
tee to the bank.   He could not, therefore, discharge his obli-
gation to the bank by his own illegal act.   Although he was
forbidden by law to give his note in payment for the stock, it
does not follow that he can repudiate the note.  *(City Bank*
v. *Barnard*, 1 *Hall*, 70.)

IV. There was plenty of consideration for the note, to wit,
73 shares of stock, at $50 a share.   It was not necessary that
the speculation should prove profitable, in order to constitute
a consideration.   If the shares could now be sold at a pre-
mium, the defendant would soon discover a good and valuable
consideration for this note.   His readiness in such a direction
is shown by the case, where it appears that he consented to
pay interest on the note of which the present is a renewal, on
being assured that it would come back to him in the form of
a dividend upon the stock.

*By the Court*, ROOSEVELT, J.   The making and indorsement
of the note sued on are admitted; but it is said that no value
was received; that by an arrangement among the directors of
the bank, of whom the defendant was one, the instrument was

never intended to be considered as a "valid promissory note," "in the hands of any person, or for any purpose whatever." On this statement of the defense, an inquiry naturally arises, for what purpose was the note given if, in every event, the promise or obligation was to be of no validity?

The case shows that the defendant was one of the original twelve subscribers to the Eighth Avenue Bank; of which the capital was $100,000, and his proportion, as expressed in the articles of association, $10,000. He, too, with his eleven associates, were the first directors. As soon as $44,000 was paid up, the bank organized and commenced business. Their purchase of securities, to deposit with the banking department, to the amount of $100,000, must, to a great extent, therefore, have been directly or indirectly on credit—and of course, on the credit of supposed bona fide paid up or secured capital. Instead, however, of paying up, the original associates and directors gave their notes for the deficiency, each for $3650, dated January 1, 1854, payable in 6 months, with interest, to some other director, and "interchangeably indorsed by the payees." At the same time also a certificate of the corresponding number of shares of stock was filled up and signed by the president and cashier in favor of each director, although not actually cut out from the certificate book. The notes were not only delivered to the cashier, but formally discounted on the books of the bank, and the proceeds carried to the respective credit of the makers; who thereupon drew their checks which were received as cash in payment of the stock and carried into the stock ledger and transfer book, "showing that each of the directors held such shares." When these notes fell due, which was of course 6 months afterwards, they were renewed for another 6 months, by the directors, as a board, for themselves individually, "omitting the indorsers," but paying the six months' interest. In three months the bank exploded, a receiver was appointed, and suits were brought by him, of which the present is one, on the several notes so given. And the defense now is, not as against other stockholders merely, but as against bona fide creditors, (for the receiver represents both) that, by an under-

standing among the directors themselves, all this was to be mere form—more properly speaking mere sham—"that no rights should be acquired by the bank, in the notes, unless the directors should elect to pay their notes and take certificates of the stock;" and that the stock having become worthless, probably by the very acts of the directors themselves, they have a right to reject, or rather to return it, and with it to repudiate the written engagements of which it is said to have formed the consideration. Can such a defense either in law or morals, be listened to? Can a director, in other words, be permitted to say that he agreed with a board of trustees, (himself being one,) that if there should be a gain on the stock he and his colleagues should receive it, and if a loss, the creditors and general stockholders should bear it? It will be said, perhaps, that such was not the agreement. In words it was not; but what, I would ask, was the distinction, in substance? The whole board gave to each of its component members the right of "election" for 6 months, and then again for 6 months more, to take or not to take the stock and to pay or not to pay the notes. What moneyed man, with such an option, would choose a loss or refuse a gain? To illustrate the position more strongly, take the case of two guardians of the estate of a minor. They agree each on his own account, with both as trustees, to speculate in cotton with the funds of their ward, giving notes for the respective amounts, after the fashion of the arrangement alleged to have been made in this instance, purporting on their face to be for value received, but with a verbal understanding that if the speculation turned out a bad one they were to be allowed to "elect" not to pay. Would it be any answer, in a suit by the substituted successor of these faithless guardians, to say that they had "elected" to nullify their written obligation? Whatever may be the force of these analogies, one thing is clear, that there was a consideration for the note which the defendant gave. It effected a compliance with the law and enabled the defendant and his eleven associates officially to report under oath that the whole amount of their "certified stock was paid in or invested," (§ 8 *of act of* 1840,) and to take the chance of a profit on their

Cowles *v.* Gridley.

shares without the risk of loss. But this is not all : the printed case states that when the defendant Gridley paid the interest on the original note, at its maturity, he did so on the assurance of the cashier, "that it would come back to him, on the making of a dividend to the stockholders." Here, then, when the second note was given, was a determination, by that very act, of the defendant's election to take the stock and to become absolutely bound for the amount. The directors, it is further contended, had no right to discount their own notes in payment of their subscriptions. The answer is, that the provision referred to (1 *R. S.* 589) had no reference to the free banks, which were expressly authorized to commence business on securities instead of cash, and, unlike the old chartered institutions, were required before issuing or even obtaining any circulation, to protect the involuntary holders of their bills by a proper deposit with the bank department of the state, of public stocks or private mort- gages. And even if the taking of the note had been prohibit- ed, would it be a legitimate satisfaction to the law to deny a recovery upon it, and thus instead of punishing, to *reward* the wrongdoer, and that at the expense of the innocent and injured creditor ? The true principle on this subject, is expressed in that section of the statute of moneyed "corporations," which, while prohibiting discounts to directors, beyond a certain amount, very properly adds the proviso, that "no securities, taken for any such loan or discount shall be held invalid." (1 *R. S.* 590.)

Judgment for plaintiff affirmed with costs.

[New York General Term, June 6, 1857. *Mitchell, Davies* and *Roosevelt,* Justices.]